324 So.2d 1 (1975)
Mrs. Leonard LEVY
v.
Mrs. Gayle K. DUCLAUX and Mrs. Patsy Desforges, d/b/a the Lazybug Shop, Defendants-Appellants, and
Employers-Commercial Union Insurance Company of America, Appellees.
No. 7117.
Court of Appeal of Louisiana, Fourth Circuit.
December 9, 1975.
Rehearings Denied January 13, 1976.
Writs Refused March 9, 1976.
*2 Stephen R. Plotkin, New Orleans, for plaintiff-appellee.
Henican, James & Cleveland, C. Ellis Henican, New Orleans, for defendants-appellants.
Drury, Lozes & Curry, Rene A. Curry, Jr., New Orleans, for defendant-third party defendant-appellee.
*3 Before STOULIG, SCHOTT and MORIAL, JJ.
SCHOTT, Judge.
This action for damages arose out of an incident which occurred on September 30, 1971, in a shop owned and operated by defendants, Duclaux and Desforges, where plaintiff was accused of shoplifting by one of defendants' employees. The primary defense was immunity from liability by virtue of LSA-C.Cr.P. Art. 215 and the comment thereunder. Defendant insurer also defended on the basis that its policy of insurance on the shop owners did not protect them against the loss pleaded and proved at the trial. Mrs. Duclaux and Mrs. Desforges also filed a third-party demand against the insurer seeking indemnification and cost of their defense.
The trial judge awarded to plaintiff judgment for $3,250 against Duclaux and Desforges but dismissed the main and third-party demand against the insurer. Mrs. Duclaux and Mrs. Desforges have appealed and plaintiff answered the appeal, seeking an increase in quantum, but the judgment dismissing the main demand against the insurer is final.
Plaintiff's evidence mainly consisted of her own testimony and that of two other customers who were in the store at the time of the incident. Defendants' evidence mainly consisted of the testimony of Mrs. Duclaux, her sister, an employee and another customer. As usual, there are numerous minor discrepancies in the testimony of these various witnesses but certain facts are uncontradicted.
The store operated by defendants was a small ladies dress shop, containing approximately 1,000 square feet of floor space. On the evening of the incident the store was conducting a "midnight sale" during which the purchase of two dresses would entitle the purchaser to a third one free. Plaintiff entered the store in the company of her four year old child, and after making several selections from a dress rack she stood in a line of customers who were waiting to enter dressing rooms where they could try on the garments they were considering purchasing. Stationed at the head of this line was Carol Johnson, an employee of the store, who had the duty of counting the garments each customer had prior to her entering the dressing room and counting the garments each customer had on her exit from the dressing room so as to eliminate the possibility of a theft occurring while a customer was inside a dressing room. Johnson recorded these numbers on a pad.
At this point the evidence is somewhat conflicting. According to plaintiff, she had selected and had with her five garments with hangers when she arrived at the head of the line and was confronted by Johnson. But Johnson testified that she then counted six garments with hangers at which time plaintiff told her that she had only five. Thus, Carol Johnson was then aware of a serious and significant discrepancy between the number she had counted and entered on her record and the number which plaintiff was saying she had. Yet Johnson said and did nothing to resolve this discrepancy, but, instead, permitted plaintiff to enter a dressing room.
Upon her exit from the dressing room plaintiff had five garments as she had indicated before she went in. She returned the garments to Johnson and returned to the dress rack a few feet away for the purpose of selecting a third garment to go with two of the others which she intended to purchase. At some point in this period of time she was approached by Johnson with questions as to whether plaintiff had taken merchandise belonging to the store. Johnson was apparently convinced that plaintiff had a sixth garment all along since before she entered the dressing room. Plaintiff and her two witnesses testified that Johnson was joined by another store employee, that they grabbed plaintiff while Johnson continued to question her and that they tugged at her purse. This testimony *4 on physical restraint was contradicted by Johnson and another customer called by defendants, but a sister of the store owner who was stationed at the front door of the premises admitted that she stopped plaintiff in an attempt to prevent her from leaving and to enable Johnson to question plaintiff. There is also a conflict as to whether plaintiff left the store or not with plaintiff and her two witnesses saying that she never left the store and defendants' witnesses testifying that she did leave with Johnson right behind her, both to return a few minutes thereafter. Whether she left or not plaintiff then emptied her purse on the floor of the store and raised her blouse and lowered her slacks within sight of the store owner and everyone else in the shop to show the absence of any garment beneath her own clothing. During these events there were from 40 to 60 people in the store and plaintiff became progressively excited to the point of crying and becoming hysterical.
The trial judge in reasons for judgment made a number of factual determinations and resolutions of conflict in the testimony of the witnesses which are accepted by us, since there is no manifest error with respect to these determinations. He found that the trial revolved around the testimony of the various witnesses "as to whether or not there was . . . an accusation against the plaintiff, a search of the plaintiff and/or a detention of the plaintiff. . ." He summarized the facts as follows:
"The defendants' witness testified that she was checking the customers prior to the time that they went into the dressing room, and, when she reached the plaintiff, she counted the garments and allegedly counted six garments. The employee then asked the plaintiff how many garments she had, and the plaintiff indicated that she had five garments and not six. It would appear to this Court that, since the checker was there and the purpose of the checker being there was to avoid any sort of shoplifting, that the checker should have, at that time, called to the attention of the plaintiff an error, if one existed, as to the number of pieces. The evidence indicated from the testimony of the defendants' witness that she jotted down the number six without calling to the attention of the plaintiff the discrepancy. The plaintiff testified that she picked out five pieces of clothing, but there was a long waiting line at the time that she got there of some five or six people, that she knew they were checking the number of pieces for each person who went inside the dressing room and told the checker that she had five pieces.
"It is from this incident alone that appears to have stemmed the whole incident. The dresses evidently were placed back on the rack, the defendant, believing the plaintiff to have six pieces rather than five, followed her through the store, through the aisles, . . . ". . . the plaintiff . . . after a series of, evidently, confrontations or conversations with the defendant, or its employees did certain gestures such as dumping her purse on the floor to show that she had nothing that belonged to the defendants, pulled her pants down some four inches to show, evidently, that she had nothing under her pants which might belong to the defendants, and, as indicated by most people, became extremely hysterical and did not completely recover until her husband arrived and calmed her down. . . ."
The court found that plaintiff was "an extremely high strung individual, evidently easily taken to becoming extremely nervous in any sort of situation of stress" and that she did become "anywhere from loud to hysterical." He concluded that plaintiff suffered damage consisting of humiliation and embarrassment in the presence of a crowd of between 40 and 60 people, for which she was entitled to compensation in the amount of $2500 and mental pain and suffering, which he found from her testimony *5 persisted until the trial began in October, 1973, and ended in April, 1974, for which he awarded her $750.
In this Court defendants contend, as they did in the trial court, that they are immune from liability by virtue of LSA-C.Cr.P. Art. 215 and comment (e) thereto which provide as follows:
"A peace officer, merchant, or a specifically authorized employee of a merchant, may use reasonable force to detain a person for questioning on the merchant's premises, for a length of time not to exceed sixty minutes, when he has reasonable cause to believe that the person has committed theft of goods held for sale by the merchant, regardless of the actual value of the goods. The detention shall not constitute an arrest."

* * * * * *

"OFFICIAL REVISION COMMENT

* * * * * *
"(e) The special provision in former R.S. 15:84.6, granting immunity from criminal and civil liability to a peace officer, merchant, or merchant's specifically authorized employee, who detained a person for questioning, is not included. If the detention is authorized under the first paragraph, immunity from both criminal and civil liability will naturally follow. If the peace officer, merchant, or employee does not comply with the terms of the first paragraph, the detention will not be authorized and there should be no immunity."
Defendants argue that there is an implicit error in the trial judge's reasons in that he did not make a factual determination that defendants did not have reasonable cause to believe that plaintiff had committed a theft before they detained her for question. They contend that they had such reasonable cause and were therefore clothed with the immunity from civil liability discussed in the comment (e).
While the reasons for judgment do not in so many words find that defendants did not have reasonable cause to believe that plaintiff had committed a theft we think this finding is implicit in the reasons. Furthermore, our own review of the evidence convinces us that they had no reasonable cause to believe that plaintiff had committed a theft. There is no suggestion by any of the witnesses that anyone was suspicious of plaintiff before she reached the head of the dressing room line. Only when the discrepancy in the number of garments developed did plaintiff come to the attention of any of defendants' employees for the first time. So the question is whether this event and those immediately following provided a reasonable cause for defendants to believe that plaintiff had committed a theft.
When Carol Johnson discovered the discrepancy before plaintiff entered the dressing room it was incumbent upon her then and there to straighten out the matter. Otherwise, the purpose of the counting procedure would be defeated. Its obvious purpose was to prevent a customer from secreting a garment either on her person, beneath her clothes, or inside of her purse while she was inside of and protected by the privacy of the dressing room. If a customer came out of the dressing room with fewer garments than she had when she entered Carol Johnson might have reasonable cause to believe that the customer had committed a theft. But here Johnson permitted plaintiff to enter the dressing room already knowing about the discrepancy and then accused plaintiff of theft on the basis of a discrepancy which was bound to exist after plaintiff left the dressing room. Under these circumstances defendants did not have reasonable cause and were not immune from liability for their actions which followed.
Our conclusion on this point is consistent with those in Stewart v. J. C. Penney Co., 267 So.2d 925 (La.App. 1st Cir. 1972), Williams v. F. W. Woolworth Co., 242 So.2d *6 16 (La.App. 4th Cir. 1970) and Chretien v. F. W. Woolworth Co., 160 So.2d 854 (La.App. 4th Cir. 1964) writ refused, 246 La. 75, 163 So.2d 356. The facts of the instant case are in sharp contrast with Lasseigne v. Walgreen, 274 So.2d 480 (La.App. 1st Cir. 1973), Durand v. United Dollar Store of Hammond, Inc. 242 So.2d 635 (La.App. 1st Cir. 1970) and Eason v. J. Weingarten, Inc., 219 So.2d 516 (La.App.3rd Cir. 1969) where opposite conclusions were reached and the merchants were found to have reasonable cause to believe that thefts had been committed.
Defendants' actions consisted of detaining plaintiff and the evidence preponderates to the effect that this detention consisted of physical restraint on plaintiff. But the gravamen of plaintiff's case is that defendants accused plaintiff of theft and made it appear to a large number of people that she was a suspect if not an actual shoplifter. Since defendants had no evidence of plaintiff's guilt and not even reasonable cause to believe her guilty their conduct was unjustified and actionable for any damages plaintiff sustained. Obviously, this was humiliating and embarrassing to plaintiff, and the record supports the trial judge's finding that she suffered mental anguish, pain and suffering. See Annot. 29 A.L.R.3d 961 (1971).
Defendants have cited many cases to show that the judgment of the trial court is excessive especially since plaintiff never consulted a physician and lost no time from her job after the incident. But the trial judge's findings quoted above are supported by the evidence and defendants have not demonstrated that he abused his discretion in setting the amount of the award. See Anderson v. Welding Testing Laboratory, Inc., 304 So.2d 351 (La.1974). The same disposition must be made of plaintiff's contention that the judgment is inadequate. See Bitoun v. Landry, 302 So.2d 278 (La.1974).
The question of the insurer's liability is perhaps the most difficult one in the case. Defendants, as third-party plaintiffs, contend that the insurance company is liable to them at least for the cost of defense if not for indemnification as well. To solve the problem, the first consideration must be the wording of the policy itself.
An "Owners' Landlords' and Tenants' Liability" policy, it purports to insure defendants as tenants of the premises where the incident occurred as follows:
"The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
Coverage A. bodily injury or
Coverage B. property damage
to which this insurance applies, caused by an occurrence and arising out of the ownership, maintenance or use of the insured premises and all operations necessary or incidental thereto, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, . . ."
The policy contains the following definitions:
"`bodily injury' means bodily injury, sickness or disease sustained by any person;
* * * * * *
"`occurrence' means an accident including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured;"
The focal point of the insurer's defense is on the terms "bodily injury" which it maintains was neither alleged nor proved by the plaintiff.
*7 In determining whether the insurer had a duty to defend in this case we have the following statement from American Home Assurance Company v. Czarniecki, 255 La. 251, 230 So.2d 253:
"Generally the insurer's obligation to defend suits against its insured is broader than its liability for damage claims. And the insurer's duty to defend suits brought against its insured is determined by the allegations of the injured plaintiff's petition, with the insurer being obligated to furnish a defense unless the petition unambiguously excludes coverage."
In plaintiff's petition the following allegations are included:

"5.
That after examining a number of dresses, plaintiff was forcibly and violently seized, assaulted and laid hold of by an employee of the defendant, acting within the course and scope of her employment, and at that time and place, falsely, publicly and maliciously accused the plaintiff of having stolen from the defendant some of the dresses on sale.

"8.
That said employee/owner refused to release the plaintiff, but on the contrary, then and there in the performance of their duties and acting within the scope of their authority, without any probable or reasonable cause therefor, threatened plaintiff with prosecution for the alleged theft, and with the knowledge and consent of the defendants, again forcibly and violently seized, assaulted, and laid hold of the plaintiff and against her will and consent, falsely and maliciously detained and imprisoned the plaintiff and compelled her to submit to a search or examination of her clothing and person at the hands of the employees of said defendant, for the alleged purpose of discovering the property claimed to have been stolen from the defendant, without any reasonable or probable cause and contrary to the laws of this State.

"9.
That by reason of said assault and said false and malicious arrest, detention and imprisonment of the plaintiff, plaintiff was subjected to great indignities, humiliation and disgrace, and was compelled to walk the entire length of defendant's store surrounded by a huge crowd of shoppers who were made aware that the plaintiff had been arrested, detained and was going to be charged with a theft.

"10.
That by reason of such exposure, arrest, detention, imprisonment and search of the plaintiff by said defendants, or their agents, acting within the scope of their employment and with the knowledge and consent of the defendant, the plaintiff was greatly injured in her credit and circumstances, and was then and there hindered and prevented from performing and transacting her necessary affairs and business and was caused to suffer much pain in both mind and body.

"12.
That as a result of said incident, plaintiff became shaken, upset, disturbed, humiliated and embarrassed, resulting in her being reduced to violent fits of crying at the time of the accident and thereafter, as well as, the crying and violent, uncontrollable, emotional reaction expressed by her minor daughter as a result of this humiliation.

"13.
That plaintiff was detained for approximately one and one-half (1½) hours before she was permitted to leave, and although she insisted that the defendants call the police, the defendants failed to and/or refused to call said New *8 Orleans Police Department to investigate the incident.

"14.
That it was necessary for plaintiff's husband to come to the defendant's premises and convey his wife and child to the family home, because said plaintiff was unable, due to her emotional condition caused by the acts of the defendant, to drive the family vehicle home and as a result thereof, said plaintiff has been forced to use tranquilizers and other medication for relaxing purposes to forget this outrageous incident.

"15.
Petitioner itemizes her damages as follows:

1. Humiliation and embarassment $25,000.00
2. False imprisonment
and/or detention 25,000.00
3. False search and seizure 25,000.00
4. Mental pain and suffering
(past, present and future) 25,000.00
 ____________
 $100,000.00"

Defendant insurer would have us confine this inquiry to the allegations of paragraph 15 which do not seem to allege bodily injury although concepts of detention and false searching and seizure certainly connote some injury to one's body. Nonetheless the rule of the last cited Supreme Court case is that the insurer has the obligation to furnish the defense "unless the petition unambiguously excludes coverage" and when all of these allegations are taken together the only conclusion can be that the petition may be ambiguous but it does not unambiguously exclude coverage. The policy required defendant to defend its insured even if the allegations had proved to be "groundless, false of fraudulent," so that defendant is liable to Mrs. Duclaux and Mrs. Desforges for their cost of defending the suit.
They seek the sum of $3500, but the sole basis for that figure is the contract entered into between them and their present counsel. This figure is not controlling on defendant insurer and the only sound basis for recovery is the fair value of services performed by defendants' counsel during conduct of this litigation. Since the record does not contain any evidence as to the amount of time required in the investigation and trial of the case along with a fair unit value for the attorney's services, the case must be remanded to the trial court so that evidence can be taken which would provide the trial judge with a proper basis for making an award to defendants against the insurer of attorney's fees and costs.
On the question of its liability for indemnification under the policy, the insurer contends that plaintiff suffered no bodily injury whatsoever and that the humiliation, embarrassment, mental anguish and anxiety suffered by plaintiff cannot be equated with bodily injury as defined in the policy.
The insurer relies heavily on Carimi v. Saia, 301 So.2d 895 (La.App. 4th Cir. 1974) and Nickens v. McGehee, 184 So.2d 271 (La.App. 1st Cir. 1966) to support its position in this regard.
In the Carimi case this Court held that a plaintiff was not entitled to recover damages for emotional distress he suffered over damages done to his automobile where he was not physically injured and was not even present when his parked car was damaged. A distinction was made as to Cooper v. Christensen, 212 So.2d 154 (La.App. 4th Cir. 1968) and Holmes v. Le Cour Corp., 99 So.2d 467 (La.App. Orl. Cir. 1958), in both of which there was medical evidence of illness or bodily harm accompanying mental distress. In Carimi the Court considered the result to be consistent with Todd v. Aetna Casualty & Surety Company, 219 So.2d 538 (La.App. 3rd Cir. 1969), writ refused 254 La. 13, 222 So.2d 66, where recovery was denied for wrongful death of an automobile owner who suffered *9 a heart attack and died upon seeing his damaged car recovered from a ditch.
The instant case can be distinguished from Carimi in several respects: Our plaintiff was present and was herself the victim of some physical abuse by being grabbed. She was subjected to immediate mental distress upon being accused a shoplifter in the presence of many people. While such an emotional experience operates primarily on the mind of a victim such suffering cannot be isolated from the body. Some physical effects must flow from the experience even if only confined to increased perspiration or adrenaline in the system. Like the Cooper and Holmes cases, in the instant case plaintiff had evidence, though not corroborated by a medical witness, that she suffered after effects, testifying that she took medication and her ability to work was lessened following the incident. The latter was to some extent corroborated by testimony of her employer. The Todd case can be distinguished because the result was unforeseeable but where a merchant accuses one of shoplifting, especially in the presence of others, emotional stress on the part of the accused customer is certainly foreseeable.
The foregoing is not directly concerned with the problem at hand which is not the right of plaintiff to recover against the defendant merchants but rather the liability of the merchants' insurer under its insurance policy. But the insurer argues that the same restriction made on recovery for damages without bodily injury in Carimi and Todd provides an insight into the proper definition of "bodily injury" in its policy. We have concluded that these cases when analyzed indicate that bodily injury does encompass the kind of injury suffered by plaintiff in the instant case.
But more pertinent to the issue is the Nickens case in which the Court construed a liability policy affording indemnity against claims for bodily injury to exclude coverage for mental anguish sustained by lessees over the destruction of their personal effects in a fire. The Court said:
"In its usual significance the term `bodily injuries' is understood to mean hurt or harm to the human body or some member thereof by contact with some external force or violence either accidental or intentional. In this respect the terms `bodily injury' and `physical injury' appear to be synonymous considering each contemplates actual physical harm or damage to a human being. However, mental distress, unaccompanied by bodily injury resulting from the application of some external force to an individual, is not generally regarded as physical or bodily injury. It is, nevertheless, within the purview of the term `personal injuries' which classification is not confined to `physical or bodily injuries' but extends to injuries to one's feelings and emotional distress or disturbance resulting from abuse, slander or libel, Martin v. Derenbecker, 116 La. 495, 40 So. 849; and in some instances from breach of contract, Lewis v. Holmes, 109 La. 1030, 34 So. 66, 61 L.R.A. 274."
When this language is analyzed particularly in the light of the facts of the Nickens case as opposed to the instant case, we reach the conclusion that the term bodily injury in the policy of our insurer does include plaintiff's injuries. In the Nickens case there is absence of any contact between an external force or violence and distress plaintiffs sustained over the loss of their personal effects. There the plaintiffs were not at the premises at the time of the fire. In the instant case, the plaintiff was personally exposed to some minimal physical abuse as well as the external force of being accused a shoplifter in front of many witnesses. The damage instantly resulted from the application of that force. This situation is entirely different from one where a hypothetical plaintiff might hear that a hypothetical defendant had some weeks previously said that plaintiff was a thief, because the sudden *10 humiliation, embarrassment and mental anguish did not set in immediately upon the direct application of the accusation. Perhaps the distinction being drawn can be made clearer by framing the Nickens case in a hypothetical variation of its facts. Suppose they made their exit from the premises without any physical injury but suffered such shock that sometime thereafter they experienced nightmares and deep mental anguish as a result of the experience. Query: Would the result of the Nickens case have been the same? The facts of our case show that plaintiff's mental distress was accompanied by immediate external physical manifestations of crying and hysteria and her functions were outwardly affected for some time after the incident. Therefore, this case is distinguishable from the Nickens case and there is coverage.
In support of its position, the insurer proffered the testimony of an underwriter to show that it was not the intention of the insurer to include damages such as those sustained by plaintiff in its indemnification against "bodily injury." There was also an attempt made to demonstrate the distinction made in such insurance policies between "bodily injury" and "personal injury" as discussed in the Nickens case. The trial judge properly excluded this testimony. An insurance policy is a contract between the company and its insured and its interpretation must be based upon what an ordinary person would understand from the words of the policy. It cannot avail the insurer any consolation if it intended something which is not clearly expressed. Any ambiguity must be construed against the insurer.
We attach significance to the fact that the policy defines bodily injury to mean "sickness or disease" in the instant case. These broad terms must include mental distress which persists over a period of time and necessitates the taking of some medication and interferes with one's performance at work. In this regard, the policy in question seems to be broader than it would have been had that definition not included the words "sickness or disease." For instance, in 44 Am.Jur.2d 72, Insurance § 1223, it is said that "the words `bodily injury' are commonly and ordinarily used to designate an injury caused by external violence, and they are not used to indicate disease," apparently referring to policy definitions which do not equate bodily injury with sickness or disease.
We are unable to separate a person's nerves and tensions from his body. It is common knowledge that worry and anxiety can and often do have a direct effect on other bodily functions. In the instant case, plaintiff's humiliation brought physical manifestations, such as tears and hysteria, which were observed and attested to by numerous witnesses. She testified that she took medication thereafter and produced the testimony of her employer who corroborated her own testimony that her ability to perform her work as a typist was adversely affected by her mental condition after this incident. We have concluded that plaintiff's humiliation, mental anguish, pain and suffering, were within the purview of coverage against bodily injury and defendants, as third-party defendants, are entitled to indemnity under the policy.
Accordingly, the judgment in favor of Mrs. Leonard Levy and against the defendants, Mrs. Gayle K. Duclaux and Mrs. Patsy Des forges, d/b/a The Lazybug Shop, is affirmed.
The judgment on the third-party demand in favor of Employers Commercial Union Insurance Company of America and against Mrs. Gayle K. Duclaux and Mrs. Patsy Desforges is reversed and set aside, and there is judgment in favor of Mrs. Gayle K. Duclaux, Mrs. Patsy Desforges, d/b/a The Lazybug Shop, and against the defendant Employers Commercial Union Insurance Company of America in the sum of $3,250.00 with interest from date of judicial demand until paid and for all costs.
*11 There is further judgment in favor of Mrs. Gayle K. Duclaux and Mrs. Patsy Desforges, d/b/a The Lazybug Shop, for costs and attorney's fees incurred by them in the defense of this suit, and the case is remanded to the trial court for the limited purpose of assessing the amount of such costs and attorney's fees in accordance with the views expressed herein.
Affirmed in part, reversed in part and remanded.